**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON TRUESDELL, on behalf of | ) | |
| himself and all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| a Delaware limited liability company | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

**PLAINTIFF'S CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

THE PARTIES ............................................................................................................... 5

   Plaintiff ...................................................................................................................... 5

   Defendant .................................................................................................................. 5

JURISDICTION AND VENUE .................................................................................... 6

FACTUAL ALLEGATIONS REGARDING GM'S LIABILITY ................................. 7

   GM Had Superior, Exclusive, and Actual Knowledge of the Headlight Defect. ...................... 9

   The Headlight Defect Poses an Unreasonable Safety Hazard .................................. 12

     2010 Cadillac SRX ............................................................................................. 12

     2011 Cadillac SRX ............................................................................................. 14

     2012 Cadillac SRX ............................................................................................. 15

     2013 Cadillac SRX ............................................................................................. 16

     2014 Cadillac SRX ............................................................................................. 16

     2015 Cadillac SRX ............................................................................................. 17

   GM Concealed the Headlight Defect From the Public ............................................ 19

GM'S PRACTICES ARE UNETHICAL AND VIOLATED ESTABLISHED ETHICAL
STANDARDS................................................................................................................ 23

   DMA Ethical Guidelines........................................................................................ 24

   AMA Statement of Ethics ...................................................................................... 26

TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL.................... 27

CLASS ACTION ALLEGATIONS ............................................................................ 28

COUNT I: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ....................... 31

COUNT II: BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS
WARRANTY ACT, 15 U.S.C. § 2303 *ET SEQ*......................................................... 33

COUNT III: VIOLATION OF THE MMPA BY MEANS OF DECEPTION............................ 34

COUNT IV: VIOLATION OF THE MMPA BY MEANS OF OMISSION OF A MATERIAL
FACT ........................................................................................................................... 37

i

COUNT V: VIOLATION OF THE MMPA BY MEANS OF UNFAIR PRACTICES-FAILURE TO DISCLOSE THE HEADLIGHT DEFECT .............................................................. 40

COUNT VI: UNJUST ENRICHMENT ........................................................................... 41

PRAYER FOR RELIEF .................................................................................................. 43

JURY DEMAND ............................................................................................................ 43

PLAINTIFF JASON TRUESDELL ("Plaintiff"), on behalf of himself and all others similarly situated, files this Complaint against Defendant General Motors LLC ("GM") based on personal knowledge as to his own actions and on information and belief, based on the investigation of counsel, as to GM's conduct and practices.

## INTRODUCTION

1.      Plaintiff brings this class action individually and on behalf of a Class of similarly situated individuals (referred to collectively as "Class Members") who purchased or leased a 2010-2015 Cadillac SRX ("Class Vehicle"), designed, manufactured, marketed, distributed, sold, warranted, and serviced by GM.

2.      This case arises out of a defect in the Class Vehicles' headlights that causes the headlights to unexpectedly and prematurely wear-out and fail. As a result of the defect the headlights emit little to no light, such that the Class Vehicles cannot safely be driven at night or in other conditions that require the use of the headlights.

3.      Specifically, on information and belief, the seals that GM used in the Class Vehicles headlights' exterior housing units wear out or deteriorate. This allows moisture to accumulate and condense from the air that flows through their vents. The housing units' vents are also defective in that they further compromise the flow and exchange of air through the improperly sealed headlights. The pooling condensation causes the headlights to malfunction and/or the bulbs to fail, by corroding lamp assembly components like the igniter and/or causing electrical shorts, among other problems. This defect in the Class Vehicles is sometimes hereinafter referred to as the "Headlight Defect."

4.      The Headlight Defect in the Class Vehicles creates a safety hazard and results in a danger to consumers, other drivers, and pedestrians. The greatly reduced light emitted from the

headlights as a result of the Headlight Defect can contribute to dangerous traffic conditions, including serious accidents.

5.      GM has been aware of the Headlight Defect in the Class Vehicles since at least 2010, as shown by Technical Service Bulletins ("TSB") that it issued and customer complaints regarding the Headlight Defect.

6.      Hundreds of owners or lessees of Class Vehicles have complained about the Headlight Defect and associated safety concerns to the National Highway Traffic Safety Administration ("NHTSA") and in informal forums online, some of which GM or its agents monitor.[1] For example, Auto Recalls for Consumers ("ARFC") is a website that re-publishes NHTSA complaints. The site included a complaint by the owner of a 2010 Cadillac SRX, originally published on June 7, 2011, regarding problems with the car's headlights that occurred in Palatine, Texas[2]:

> THE CONTACT OWNS A 2010 CADILLAC SRX. THE CONTACT WAS DRIVING APPROXIMATELY 60 MPH WITH THE LOW BEAM HEADLIGHTS IN ACTIVATION HOWEVER, THEY EXHIBITED EXTREMELY POOR LIGHTING. THE HEADLIGHTS FAILED TO ILLUMINATE THE ENTIRE ROAD. THE VEHICLE WAS TAKEN TO AN AUTHORIZED DEALER WHERE THEY DID NOT HAVE THE PROPER EQUIPMENT TO PERFORM A DIAGNOSIS ON THE HEADLIGHTS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE PROBLEM. THE APPROXIMATE FAILURE MILEAGE WAS 100.

---

[1] GM admits to monitoring consumer complaints online, as evidenced by the following articles: "GM's social media team helps resolve complaints, keep customers," available at https://www.autonews.com/article/20131021/OEM06/310219873/gm-s-social-media-team-helps-resolve-complaints-keep-customers (accessed 7/24/19) (referencing GM's team of 18 employees who monitor 90 auto-enthusiast sites for complaints); "G.M. Uses Social Media to Manage Customers and Its Reputation," available at https://www.nytimes.com/2014/03/24/business/after-huge-recall-gm-speaks-to-customers-through-social-media.html (accessed 7/24/19) ("G.M. has a team of about 20 people based in Detroit that manages its social media presence-including monitoring about 100 independent auto forums- and responds to inquiries and complaints seven days a week); "How GM Uses Social Media to Improve Cars and Customer Service," available at https://hbr.org/2016/02/how-gm-uses-social-media-to-improve-cars-and-customer-service (accessed 7/24/19) (GM actively monitors vehicle owner forums and other social media platforms to identify potential issues).

[2] *Available at* http://www.arfc.org/complaints/2010/cadillac/srx/10405415.aspx (accessed 7/20/19).

7.     Another complaint, posted at CarProblemZoo.com, sets forth a range of concerns associated with the Headlight Defect, including safety issues, the cost of replacing the headlights, and the problem with replacing the defective headlights with headlights that have the same defect [3]:

> After a rainy day, I got into my 2011 Cadillac SRX to head home from work. I was driving down the road when both headlights went out. Ii [*sic*] was lucky that I did not wreck or someone didn't hit me!!! I had this diagnosed at a certified Cadillac dealership and the problem is faulty seals on the light assembly housing. It will cost 2959.90 to get this problem fixed, however in reading on line, the replacements aren't any better than what I have on it right now.

8.     GM has not taken responsibility for this known defect. It has not issued a recall or otherwise offered to replace the defective headlights in Class Members' vehicles with non-defective headlights at no cost to Class Members. Nor did GM inform consumers of the Headlight Defect prior to their purchases of Class Vehicles despite its knowledge.

9.     Since 2010, in an effort to address owner complaints regarding the Headlight Defect, GM has issued a Customer Satisfaction Campaign and several TSB's, as detailed below. However, these efforts have been entirely inadequate in resolving the Headlight Defect or providing relief, or even in alerting the vast majority of owners or lessees of Class Vehicles that their Class Vehicles have a dangerous defect that needs repair.

10.     In fact, rather than redesigning the defective components and installing non-defective components, GM purports to "repair" the Class Vehicles by simply replacing defective components with the same defective components. Further, Class Vehicle owners or lessees incur out-of-pocket costs for these repairs because GM refuses to extend the warranty to cover them or issue a recall to prevent them. GM thus unfairly shifts the costs to the Class Members, and

---

[3] *See* Ex. A, *Headlight problems of the 2011 Cadillac SRX- part 1: Failure Date: 11/12/2018*, *available at* http://www.carproblemzoo.com/cadillac/srx/2011/headlights-problems.php (accessed 7/23/19).

benefits from the revenue generated by repeat repairs. Accordingly, consumers will be required to pay hundreds, if not thousands, of dollars to repair or replace the headlights and related components as a result of the Headlight Defect, and GM is unjustly enriched at their expense.

11.     On information and belief, all of the Class Vehicles are equipped with the same or substantially identical headlight assemblies, and the Headlight Defect is the same for all Class Vehicles.

12.     Beginning as early as 2010, through consumer complaints and dealership repair orders, among other internal sources, GM knew or should have known of the Headlight Defect in the Class Vehicles that adversely affects the drivability of the Class Vehicles and causes safety hazards. Nevertheless, GM has actively concealed and failed to disclose this defect to Plaintiff and Class Members prior to the time of purchase or lease and thereafter.

13.     On information and belief, GM's corporate officers, directors, or managers knew about the Headlight Defect and failed to disclose it to Plaintiff and Class Members, at the time of sale, lease, repair, and thereafter.

14.     Because GM has not notified Class Members that the headlights are defective, Plaintiff and Class Members (as well as members of the general public) remain subject to conditions that create dangerous and unexpected driving hazards.

15.     On information and belief, the alleged Headlight Defect is inherent and was present in all the Class Vehicles at the time of sale.

16.     GM knew about the Headlight Defect, along with its attendant dangerous safety implications, but concealed its knowledge from Plaintiff and Class Members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the defects in the defective headlights,

4

GM either refused to acknowledge the existence of the Headlight Defect, or performed repairs that simply masked its effects.

17.     GM's actions as alleged herein violate the Missouri Merchandising Practices Act ("MMPA"), § 407.010 *et seq*, by means of unfair practices, deception and omissions, constitute unjust enrichment, and breach its implied warranties with Plaintiff and Class Members.

## THE PARTIES

**Plaintiff**

18.     Plaintiff Jason Truesdell is a resident of St. Louis County and a citizen of the State of Missouri. In February of 2014 he purchased a 2014 Cadillac SRX that has the Headlight Defect described herein.

**Defendant**

19.     Defendant General Motors LLC is a Delaware limited liability company with its principle place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Missouri. Its Registered Agent in Missouri is CSC of St. Louis County, Inc., 130 S. Bemiston Avenue, Suite 700, Clayton, MO 63105. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principle place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

20.     General Motors LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class

Vehicles, nationwide and in Missouri. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

21.     At all relevant times, GM was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Missouri and throughout the United States.

22.     GM emphasizes the quality and reliability of the Class Vehicles and knows that consumers, including Plaintiff and Class Members, rely upon such factors when purchasing or leasing Class Vehicles. For example, the Cadillac brochure "Introducing the All-New 2010 SRX Crossover," assures consumers that "[e]very detail of the SRX Crossover has been carefully considered."[4] The brochure for the 2011 Cadillac SRX extols its virtues and assures consumers specifically that "passenger safety is a primary consideration throughout the engineering process...[and] the SRX was designed to help avoid collisions."[5] The 2012 Cadillac SRX brochure states categorically that the vehicles' "Adaptive Forward Lighting...provide[s] optimal illumination closer or farther down the road."[6] And the "2015 SRX" brochure asserts that the "available HD headlamps with Adaptive Forward Lighting help guide you around curves and corners at night."[7]

**JURISDICTION AND VENUE**

23.     This is a class action under Rule 23 of the Federal Rules of Civil Procedure.

---

[4] Cadillac, "The All-New 2010 SRX Crossover," *available at* http://www.motorologist.com/wp-content/uploads/2010-Cadillac-SRXbrochure.pdf (accessed 7/20/19).

[5] Cadillac, "The 2011 SRX Crossover," *available at* http://www.motorologist.com/wp-content/uploads/2011-Cadillac_SRX-brochure.pdf (accessed 7/20/19).

[6] Cadillac, "The 2012 Cadillac SRX," *available at* http://www.motorologist.com/wp-content/uploads/2012-cadillac_srx_brochure.pdf (accessed 7/20/19).

[7] Cadillac, "2015 SRX," *available at* http://www.motorologist.com/wp-content/uploads/2015_Cadillac-SRX-brochure.pdf (accessed 7/20/19).

24.     This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §

1332(d). Because Plaintiff and GM are citizens of different states, there is minimal diversity. The

amount in controversy exceeds $5,000,000 exclusive of interest and costs. There are at least 100

Class Members.

25.     GM, through its business of distributing, selling, and leasing the Class

Vehicles, has established sufficient contacts in this district such that personal jurisdiction is

appropriate. GM is deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

26.     In addition, a substantial part of the events or omissions giving rise to these

claims took place in this district. Plaintiff purchased his 2014 Cadillac SRX, which is the subject

of this action, from ELCO Cadillac, an authorized Cadillac dealer in St. Louis County, Missouri.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### FACTUAL ALLEGATIONS REGARDING GM'S LIABILITY

28.     Since 2010, GM has designed, manufactured, distributed, sold, and leased the

Class Vehicles equipped with the Headlight Defect in Missouri directly or indirectly through

dealers and other retail outlets to hundreds or thousands of Class Members.

29.     Upon information and belief, the seals in the Class Vehicles' headlight assemblies

wear out or deteriorate unexpectedly and prematurely, allowing moisture to accumulate and

damage the assemblies' internal components. Upon further information and belief, the vents that

allow air flow to maintain pressure and prevent the lenses from cracking increase the tendency

for water to accumulate and condense in the housing units. These defects result in damage to

assembly components, such as corroding igniters and burnt-out bulbs.

30.     The Class Vehicles are unreasonably dangerous to consumers because the

Headlight Defect prevents their safe operation. For example, as the Headlight Defect progresses,

the excessive accumulation of water or condensation can damage crucial components—like the

7

igniter and the bulb—resulting in diminished light output or catastrophic failure. Malfunctioning or inoperative headlights impair the driver's ability to operate the vehicles safely, because they decrease the driver's visibility and make the Class Vehicles themselves more difficult for other drivers or pedestrians to see. Plaintiff and Class Members have also resorted to using their high beams as their main source of light when driving at night, risking the blinding of drivers in front of them or in the opposite direction. In short, the dim light output resulting from the Headlight Defect raises the risk of accidents, particularly after dusk, before dawn, or in inclement weather.

31.     The Headlight Defect is inherent in all Class Vehicles and is the same for all Class Vehicles.

32.     The Headlight Defect diminishes the intrinsic and resale value of Class Vehicles.

33.     Since at least 2010, GM has been aware of the Headlight Defect but has failed to disclose it to consumers. As a result of GM's unfair, misleading, deceptive, and/or fraudulent business practices, in failing to disclose the Headlight Defect to Plaintiff and Class Members, Plaintiff and Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by GM's conduct.

34.     Specifically, Plaintiff and Class Members have had to change their driving habits, including avoiding driving at night or in inclement weather, and have had to expend substantial money and time attempting to repair the Headlight Defect. Moreover, had Plaintiff and Class Members known of the Headlight Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Moreover, because of the Headlight Defect, the Class Members' vehicles have a lower market value, and are inherently worth less than they would be without the Headlight Defect.

**GM Had Superior, Exclusive, and Actual Knowledge of the Headlight Defect.**

35.     GM had superior and exclusive knowledge of the Headlight Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

36.     Demonstrating GM's knowledge is GM's Customer Satisfaction Campaign ("CSC") No. 10043330-5822, issued in December of 2011, that covered the 2010 Cadillac SRX and identified a condition caused by the loss of electrical contact between the halogen headlamp connectors and low beam headlamp bulbs that "could cause the headlamp and/or daytime running lamp to work intermittently." *See* Ex. B. This CSC offered to replace the headlamp connectors and low beam bulbs free of charge (only through December 31, 2013) or to reimburse customers who previously had paid for this repair but did not fix the root cause of the malfunction or exclude the accumulation of moisture and/or condensation in the housing.

37.     In addition, GM has released several iterations of TSBs regarding an inoperative low beam headlamp since May 2010 to address this issue with its dealers. In May 2010, GM issued the initial TSB, Bulletin No. 10-08-42-001[8], which applied to various vehicles, including the 2010 Cadillac SRX. The bulletin alerted service technicians that "[s]ome customers may comment that the low beam headlamp is inoperative." The recommended procedure included replacing the bulb and verifying any discoloration or damage to the connector that would require the replacement of that part, too. The TSB was re-issued in August 2010, as Bulletin No. 10-08-42-001A, to add vehicles, including the SRX model year 2011, and update the relevant part number. *See* Ex. C. GM subsequently updated the bulletin at regular intervals, releasing Bulletin No. 10-08-42-001C in

---

[8] Available at https://workshop-manuals.com/cadillac/srx_awd/v6-3.0l/starting_and_charging/power_and_ground_distribution/wiring_harness/component_information/technical_service_bulletins/all_technical_service_bulletins_for_wiring_harness/10-08-42-001/may/10/lighting_low_beam_headlamp(s)_inoperative/ (accessed 7/21/10).

February 2012 (Ex. D), Bulletin No. 10-08-42-001D in November 2014 (Ex. E), and Bulletin No.

10-08-42-001E in May 2015 (Ex. F), which included the SRX model years 2010-2013. The

updated TSB explained the repair procedure in far greater detail, including replacing the wiring

harness and inspecting the connector for discoloration at the bulb interface.

38. At the time that GM issued the TSBs to its dealers it did not issue a notice to its

consumers, the Class Members or prospective purchasers.

39. GM did not disclose the cause of the malfunction to its dealers or customers or the

likelihood of recurrence because it was not actually correcting the defect, but merely replacing the

Headlights with the same type of defective Headlights. Like the CSC, the TSBs do not identify the

root cause of the malfunction or exclude the accumulation of moisture and/or condensation in the

housing.

40. On information and belief, before Plaintiff purchased his Class Vehicle, and since

at least 2010, GM knew or should have known about the Headlight Defect through sources in its

exclusive custody and control and thus not available to consumers, including pre-production

design failure mode and analysis data, production design failure mode and analysis data, pre-

release testing data, early consumer complaints about the Headlight Defect to GM and its agents,

testing conducted in response to those complaints, high failure rates and replacement part sales

data, and other aggregate data from Cadillac dealers.

41. Further, upon information and belief, GM, like other car manufacturers, regularly

monitors the NHTSA database for consumer complaints. As set forth below, the NHTSA database

is replete with complaints of the Headlight Defect, including complaints of accidents and near

accidents, indicating GM's awareness of the Headlight Defect and of the attendant hazards it creates

for consumers and the general public.

42.     Accordingly, before Plaintiff purchased his Class Vehicle, and since at least 2010, GM knew about the Headlight Defect.

43.     On information and belief, GM agreed to reimburse California and Florida residents who owned or leased the Class Vehicles described herein for prior out-of-pocket headlight replacement costs for "moisture related issues" up to $1,600 per replacement, following similar lawsuits with respect to California and Florida residents.[9]

44.     Such agreement does not apply to Missouri residents who own or lease Class Vehicles, nor would it sufficiently remedy their damages, as many if not all Class Members have suffered damages in excess of this amount. Furthermore, by replacing the defective headlights with the same defectively designed parts, the replacement headlights will also suffer from the Headlight Defect.

45.     The existence of the Headlight Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle.

46.     Had Plaintiff and other Class Members known that the Class Vehicles were equipped with defective headlights, they would not have purchased or leased the Class Vehicles or would have paid less for them.

47.     Consumers, like Plaintiff, reasonably expect that a vehicle's headlights are safe, will function in a manner that will not pose a safety hazard, and are free from defects. Plaintiff and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Headlight Defect, and will disclose any such defects to consumers when it learns of them. Plaintiff and Class Members did not expect GM to fail to disclose the Headlight Defect to them and to continually deny the defect.

---

[9] A summary of this agreement is available on the website for Berger Montague, counsel for the Florida residents, at https://bergermontague.com/news/cadillac-srx-defective-headlights-case-settles/ (accessed 7/23/19).

**The Headlight Defect Poses an Unreasonable Safety Hazard**

48.     The Headlight Defect impairs or prevents Plaintiff and Class Members from driving the Class Vehicles safely. These hazards include very dim light output that diminishes visibility or catastrophic failures that effectively preclude visibility. Driving with poor visibility due to such conditions presents dangers to Plaintiff and Class Members, other drivers, and pedestrians by significantly increasing the risk of collisions. No consumer expects to purchase or lease a vehicle that may be non-operational before dawn, after dusk, or in inclement weather. The safety risk imposed by the Headlight Defect is objectively unreasonable.

49.     Upon information and belief, thousands of purchasers and lessees of Class Vehicles have experienced problems with the headlights. Complaints filed by consumers with NHTSA and elsewhere online demonstrate that the defect is widespread, dangerous, and manifests without warning.

50.     Upon information and belief, GM, like other car manufacturers, regularly monitors the NHTSA database for consumer complaints. As such, these complaints also indicate GM's awareness of the Headlight Defect and of the attendant hazards it creates for consumers and the general public. The following are selections of safety complaints relating to the Headlight Defect, among the multiple hundreds filed with NHTSA, describing, *inter alia*, the danger of driving with dim light output, the out-of-pocket costs that Class Members have to pay, and the fact that GM is aware of the Headlight Defect (*all caps; spelling, and grammar in original*). *See* https://www.nhtsa.gov/vehicle (accessed on July 21, 2019).

**2010 Cadillac SRX**

a.     November 6, 2014: PASSENGER HEADLIGHT (SEALED BEAM) FAILED TO TURN ON 2 DAYS AGO. I ASSUMED IT WAS A BULB BUT THE DEALER IDENTIFIED ITAS A SHORT DUE TO WATER AND CONDENSATION ACCUMULATION INSIDE THE HOUSING. THE

LIGHT DID COME BACK ON FOR A SHORT TIME WHILE DRIVING TO THE DEALERSHIP, BUT WAS OFF AGAIN UPON ARRIVAL. DEALER STATED THE OTHER LIGHT WOULD BE AFFECTED SOON AS WELL, BASED ON WATER INSIDE IT TOO. I HAVE THE HIGHEST LEVEL EXTENDED WARRANTY PLAN (GM MAJOR GUARD), BUT THE SEALED BEAM HEADLIGHTS ARE EXCLUDED FROM THIS PLAN. DEALER QUOTED COST OF $1,800 PER LIGHT, TOTAL OF $3,600 TO REPAIR. THIS IS A DESIGN FLAW, BASED ON NUMEROUS CADILLAC COMPLAINTS AS WELL AS NOTES FOUND ON NHTSA. IN ITS CURRENT STATE, THE VEHICLE IS NOT DRIVABLE IN LOW VISIBILITY CONDITIONS OR AT NIGHT BECAUSE THE HEADLIGHTS HAVE FAILED DUE TO A DESIGN FLAW. DEALER WILL NOT REPAIR UNDER WARRANTY, AND WITHOUT REPAIR THE VEHICLE WILL NOT EVEN PASS A STATE SAFETY INSPECTION. THIS IS A RECALL WORTHY FAULT WHICH COULD LEAD TO LOSS OF LIFE IF FAULT OCCURS IN LOW VISIBILITY OR NIGHT DRIVING, AND RENDERS THE VEHICLE UNSAFE AS IT WILL NOT PASS STATE SAFETY INSPECTION. PLEASE FORCE GM TO ISSUE RECALL ON THIS ISSUE. I AM CURRENTLY TRYING TO FIGURE OUT HOW TO PAY ALMOST $4,000 ON MY $56K VEHICLE TO GET IT DRIVABLE AGAIN, WHEN IT'S UNDER THE PREMIERE WARRANTY PLAN. THIS POLICY IS UNSATISFACTORY AT BEST. *TR

b.    December 1, 2014: I OWN A 2010 CADILLAC SRX. THE PASSENGER HEADLAMP HAS ACCUMULATED SOME CONDENSATION. AS I WAS READING ONLINE THIS IS A KNOWN FLAW OF DESIGN FOR THIS MODEL (EVEN 2013 MODELS) THAT GM IS AWARE OF. AS THE HOLIDAY APPROACHED WE TRAVELED OUT OF TOWN. AS WERE LEAVING I WAS TOLD BY A FAMILY MEMBER THAT MIGHT PASSENGER HEADLAMP WAS INOPERABLE. SO MY GUESS WAS THAT IT WAS EITHER A SAFETY MECHANISM THAT THE CAR WILL SHUT THE LIGHT OUT TO PREVENT A SHORT OR WORST A FIRE. WELL IT WAS COMPLETE OPPOSITE. THIS MORNING MY LOCAL CADILLAC DEALERSHIP HAS CONCLUDED THE KNOWN FLAW IN THE HEADLAMP ACTUALLY SHORTED OUT MY BULD. NOW I HAVE RECEIVED A QUOTE FOR OVER $1000++ TO REPLACE A FLAW IN THEIR DESIGN. HOW IS THIS GOOD BUSINESS? IF IT IS A KNOWN ISSUE TAKE CARE OF IT RIGHT? THIS IS A DESIGN FLAW BASED ON NUMEROUS CADILLAC COMPLAINTS AS WELL AS NOTES FOUND ON THIS VERY NHTSA WEBSITE. IN IT'S CURRENT STATE,

13

THE VEHICLE IS NOT DRIVABLE IN LOW VISIBILITY CONDITIONS OR AT NIGHT BECAUSE THE HEADLIGHTS HAVE FAILED DUE TO A DESIGN FLAW. DEALER WILL NOT REPAIR UNDER EXTENDED WARRANTY AND WITHOUT REPAIR THE VEHICLE WILL NOT EVEN PASS A STATE SAFETY INSPECTION. THIS IS A RECALL WORTHY FAULT WHICH COULD LEAD TO LOSS OF LIFE IF FAULT OCCURS IN LOW VISIBILITY OR NIGHT DRIVING, AND RENDERS THE VEHICLE UNSAFE AS IT WILL NOT PASS STATE SAFETY INSPECTION. PLEASE FORCE GM TO ISSUE RECALL ON THIS ISSUE. *JS

c.   February 7, 2018: PASSENGER HEADLIGHT ASSEMBLY IS FULL OF WATER, POSSIBLY DUE TO A FAULTY SEAL. THIS IS A KNOWN ISSUE AMONG OWNERS, AND WILL EVENTUALLY CAUSE THE HEADLIGHT TO SHORT OUT AND BECOME INOPERABLE. REPLACEMENT IS OVER $1500, AND CADILLAC REPLACES ASSEMBLIES WITH THE SAME FAULTY SEAL.

d.   December 30, 2018: THE LIGHTS ARE EXTREMELY DIM. VERY DANGEROUS ON THE ROAD. I'VE REPLACED THE FUSES FOR THE HEADLIGHTS. I'VE REPLACED THE ENTIRE HEADLIGHT ASSEMBLY AND STILL NO LUCK. ONE DONE RESEARCH ONLINE AND THERE ARE NUMEROUS PEOPLE COMPLAINING ABOUT THIS ISSUE. CADILLAC WILL NOT FIX IT.

**2011 Cadillac SRX**

a.   October 24, 2013: THE LOW BEAM HEADLIGHTS ARE VERY DIM. THEY DO NOT REACH OUT LIKE THEY SHOULD. DEALER TELLS ME THAT'S THE WAY THEY ARE, I DO NOT FEEL THEY ARE SAFE!!! *TR

b.   October 13, 2015: TL* THE CONTACT OWNS A 2011 CADILLAC SRX. WHILE DRIVING AT VARIOUS SPEEDS, THE LOW BEAM HEAD LAMPS FAILED TO FULLY ILLUMINATE AND DIMINISHED THE CONTACT'S VISIBILITY. THE CONTACT HAD TO ACTIVATE THE HIGH BEAMS IN ORDER TO INCREASE VISIBILITY. THE VEHICLE WAS TAKEN TO A DEALER WHO WAS UNABLE TO DIAGNOSE OR REPAIR THE VEHICLE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 30,000.

c.   February 15, 2016: LOW BEAMS ARE TOO DIM. WHEN I'M ON ROADS THAT DO NOT HAVE REFLECTIVE STRIPES I CAN'T SEE THE SIDES OF THE ROAD. THIS IS PARTICULARLY DANGEROUS WHEN APPROACHING ONCOMING TRAFFIC.

d.   December 13, 2017: EXTREME MOISTURE BUILDUP IN BOTH HEADLIGHT ASSEMBLIES CAUSING DECREASED NIGHTTIME VISIBILITY AND ADDITIONALLY CAUSING BULBS TO BLOW OUT. PURCHASED 2011 SRX USED IN 2017 WITH 63,000 MILES, NOT AWARE OF THE DEFECT AT THAT TIME. A LIMITED WARRANTY WAS ALSO PURCHASED FOR AN ADDITIONAL $2700 BUT WAS INFORMED AFTER ASKING THE DEALERSHIP TO INVESTIGATE THAT DEFECTIVE HEADLIGHTS ARE NOT COVERED. QUOTED ALMOST $5,000 TO REPLACE BOTH. THIS IS HIGHLY UNSAFE AS WELL AS UNFAIR TO THE PUBLIC, NOT ONLY THE RISK OF FAILURE POTENTIALLY CAUSING BODILY HARM BUT I DO NOT BELIEVE THAT I SHOULD BE REQUIRED TO PAY AN ADDITIONAL $5,000, NOT INCLUDING THE WARRANTY PURCHASED, TO REPAIR A MANUFACTURER'S DEFECT.

e.   November 27, 2018: BOTH HEADLIGHTS ARE DIM EVEN AFTER PUTTING NEW HEADLIGHT BULBS IN. ONE HEADLIGHT HAS ALSO ACCUMULATED MOISTURE FROM THE WEATHER WHICH HAS CAUSED A YELLOW TINT WHICH ALSO DIMS THE LIGHTING. I HAVE TO USE MY HIGH BEAMS TO SEE TURNS WHICH IS DANGEROUS FOR ME AND OTHER DRIVERS. THE FACT THAT I PUT NEW BULBS IN AND STILL CAN'T SEE WHEN I'M DRIVING IS A HUGE PROBLEM AND I FEAR AN ACCIDENT COULD HAPPEN BECAUSE OF THIS FAULT.

f.   December 25, 2018: HEADLIGHTS VERY LOW. CAN'T SEE ROAD AT NIGHT. ON COMING VECHICLES HONK THEIR HORN AT YOU CAUSE THEY THINK YOUR LIGHTS ARE OFF. HAVE TO DRIVE ON HIGH BEAMS. KEEP HAVING TO REPLACE BULBS.

**2012 Cadillac SRX**

a.   December 26, 2016: LOW BEAM HEADLAMPS ARE DISFUNCTIONAL. THEY ARE SO DIM, YOU CANNOT DRIVE THE VEHICLE AT NIGHT WITHOUT THE AIDE OF THE HIGH BEAM HEADLAMPS.

b.   April 29, 2017: MOISTURE BUILDUP IN FRONT HEADLIGHTS CAUSED BULBS TO SHORT OUT AND NOW NOT WORKING ON LOW BEAM. THIS IS A MAJOR SAFETY ISSUE AND FROM WHAT I HAVE SEEN HAPPEN QUITE OFTEN ON THIS PART OF THE CADILLAC SRX. WENT TO DEALERSHIP TO HAVE IT REPLACED AND SINCE OUT OF WARRANTY IT WAS GOING TO BE ~ $2K. RIDICULOUS!

c.   January 1, 2019: I PURCHASED MY 2012 IN 2016. RECENTLY MY HEADLIGHTS HAVE STARTED TO DIM. IT BECOMES VERY HARD

TO SEE AT NIGHT TO THE POINT THAT IT ALMOST LOOKS AS IF I DON'T HAVE ANY LIGHTS ON IT ALL. MOST OF THE TIME I HAVE TO CUT MY HIGH BEAMS ON WHICH CREATES A PROBLEM FOR ONCOMING TRAFFIC.

**2013 Cadillac SRX**

a.   July 19, 2017: THE HEADLIGHTS ON THIS VEHICLE ARE DANGEROUSLY DIM. I HAVE SPOKEN TO NUMEROUS OWNERS WHO SUGGESTED THE SAME ISSUE. THE DEALERSHIPS WANT TO CHARGE OVER $2000.00 TO CORRECT THIS AND IT IS NOT CLEAR THAT REPLACING THESE LIGHTS WITH THE SAME LIGHTS WILL REPAIR THE ISSUE. THIS NEEDS GOVERNMENT ACTION OR PEOPLE WILL GET HURT.

b.   March 6, 2018: HEADLIGHTS ARE SO DIM THAT I HAVE TO DRIVE WITH BRIGHTS ON CONTINUOUSLY AT NIGHT. WHEN ONCOMING TRAFFIC SIGNALS ME BY BLINDING ME, I SWITCH TO DIMS AND HAVE TO GUESS AT WHERE THE ROAD IS. THIS IS UNACCEPTABLE. THE VEHICLE WAS BROUGHT IN WHILE STILL UNDER BASIC WARRANTY. PROBLEM NOT RESOLVED. I EVEN PURCHASED AN EXTENDED WARRANTY. NO HELP THERE EITHER. I AM PAYING FOR A VEHICLE THAT I CANNOT SAFELY DRIVE AT NIGHT. NO WAY I CAN LET MY KIDS USE THIS VEHICLE AT NIGHT. I AM DEEPLY DISAPPOINTED.

**2014 Cadillac SRX**

a.   June 2, 2014: TL* THE CONTACT OWNS A 2014 CADILLAC SRX. THE CONTACT STATED THAT WHILE DRIVING AT NIGHT WITH THE LOW BEAM HEADLIGHTS ACTIVATED THE LIGHTS WERE VERY DIM MAKING AND CAUSING THE CONTACT DIFFICULTY IN SEEING PAST 50 FEET IN FRONT OF THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER HOWEVER, THE FAILURE COULD NOT BE DIAGNOSED. THE MANUFACTURER WAS NOT NOTIFIED OF THE ISSUE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 200.

b.   February 22, 2017: LOW BEAM HEADLIGHTS ARE SO DIM THAT THEY ARE AN ACCIDENT IN WAITING. THEY DO NOT PROJECT FAR ENOUGH TO AVOID "OVER DRIVING" THEM. DEALER SAYS THEY ARE ADJUSTED TO SPEC. PEDESTRIANS ARE AT RISK AS IS THE RISK OF HITTING WILDLIFE. IN AMBIENT LIGHT CANNOT TELL THE LIGHTS ARE EVEN ON! HAVE INSTALL. D BRIGHTER BULBS TO NO

AVAIL. THIS PROBLEM IS INHERENT IN THE CADILLAC AND NEEDS TO BE ADDRESSED AT THE NHTSA. PROBLEM NOTED ALL OVER THE WEB.

c. August 27, 2018: DIM HEADLIGHTS ARE VERY LOW. VERY UNSAFE TO DRIVE AT NIGHT WITH DIM LIGHTS ON. WE HAVE NOTICED THAT THE BLINKER IS BRIGHTER THAN THE ACTUAL LIGHTS. VERY LOW VISABILITY. WHEN DRIVING I OFTEN THINK THE LIGHTS ARE NOT ON WHEN THEY ARE ON LOW BEAM. WOULD NOT BE ABLE TO SEE A CHILD OR ANIMAL (OR ANY OBJECT) IN PATH OF VEHICLE WHEN DRIVING AT NIGHT. OUR SRX IS BLACK SO I'M ALSO CONCERNED ABOUT OTHER VEHICLES SEEING US AT NIGHT W/SUCH POOR LIGHTING. TOTAL DEFECT IN DESIGN. MY HUSBAND WILL DRIVE IT AT NIGHT, BUT I REFUSE TO.

d. December 2, 2018: JULY 4, 2018 I WAS INVOLVED IN A REAR END COLLISION WHERE I RAN INTO THE BACK OF A VEHICLE AROUND 9:45PM. IT BOTHERED ME THAT I DID NOT SEE THE CAR UNTIL I WAS RIGHT ON HER. ALL OF A SUDDEN I SAW HER CAR AND SHE WAS MOVING NOT STANDING STILL. IT DAWNED ON ME THAT I COULD NOT SEE HER CAR OR JUDGE THE DISTANCE FROM HER BECAUSE MY HEADLIGHTS ARE NOT BRIGHT ENOUGH TO SEE WHAT IS IN FRONT OF ME. I CAUSED MY INSURANCE RATES TO GO UP. I HAVE NOT BEEN IN A VEHICLE ACCIDENT SINCE THE LATE 1970S. I AM A GOOD DRIVER AND WAS NOT DISTRACTED IN ANY WAY. OVER $3,000 WORTH DAMAGE WAS DONE TO MY CAR AND I'M NOT SURE HOW MUCH TO THE VEHICLE I HIT. CADILLAC NEEDS TO DO SOMETHING ABOUT THE HEADLIGHTS BEFORE THERE IS A SERIOUS ACCIDENT. I HAVE TO DRIVE WITH MY HIGH BEAMS. I WAS DRIVING ON A TWO WAY BRIDGE AND BOTH CARS WERE IN MOTION.

**2015 Cadillac SRX**

a. November 28, 2017: WE ARE DRIVING BLIND !!!! PURCHASED OUR 2015 CADILLAC SRX AWD IN NOVEMBER 2017 AFTER RESEARCHING ON BOTH CONSUMER REPORTS AND EDMUNDS... DID OUR TEST DRIVE IN DAYLIGHT... NOW THAT WE'RE OWNERS WE REALIZE THE CAR CANNOT BE DRIVEN AT NIGHT. THE LOW BEAM HEADLAMPS ARE SO DIM ITS WORSE THAN DRIVING WITH PARKING LIGHTS ONLY. WE ARE NOW SHOCKED TO SEE THAT

THERE ARE MANY SERIOUS COMPLAINTS ABOUT THIS VERY PROBLEM ALL OVER THE WEB EVERYWHERE EXCEPT FOR THE TWO ABOVE MENTIONED REVIEWERS .IT'S LITERALLY LIKE DRIVING IN THE DARK. WE HAVE TO COORDINATE WHO HAS THE CAR WHEN JUST TO GET HOME SAFELY. PLEASE DO NOT IGNORE THIS!!! THIS IS A SERIOUS FLAW IN GM MANUFACTURING... CANT BELIEVE IT HAD NOT BEEN ADDRESSED. OPERATING THIS VEHICLE AFTER DARK RISKS INJURY OR DEATH. DEALERSHIP TURNING BLIND EYE. THEY WERE HAPPY TO GET RID OF IT? WE WILL NOT LET THIS GO AND INTEND TO DO ALL WE CAN TO EXPOSE, AND DEMAND THIS PROBLEM IS RECTIFIED ASAP.

b.   January 22, 2018: TL* THE CONTACT OWNS A 2015 CADILLAC SRX. WHILE DRIVING VARIOUS SPEEDS, BOTH LOW BEAM HEADLIGHTS FAILED TO WORK WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER (CROSBY CADILLAC, GMC, NISSAN, INC, 2715 MEMORIAL DR, WAYCROSS, GA 31503) WHERE IT WAS DIAGNOSED THAT BOTH LOW BEAM LIGHTS NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT CONTACTED. THE APPROXIMATE FAILURE MILEAGE WAS 55,000.

c.   December 31, 2018: TL* THE CONTACT OWNS A 2015 CADILLAC SRX. THE CONTACT STATED THAT THE DIMMER FAILED TO FUNCTION PROPERLY AND THE DAYTIME RUNNING LAMPS DID NOT ILLUMINATE BRIGHTLY ENOUGH. THE CONTACT HAD TO APPLY THE HIGH BEAM HEADLIGHTS IN ORDER TO SEE THE ROAD. ANDREWS CADILLAC (1 CADILLAC DR, BRENTWOOD, TN 37027, (615) 200-9076) WAS CONTACTED AND WERE AWARE OF THE FAILURE, BUT STATED THERE WAS NO REMEDY. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE.

d.   December 28, 2018: DIM HEADLIGHTS ARE DEFECTIVE. I CAN BARELY SEE TO DRIVE AT NIGHT. THERE ARE GROUPS ON FACEBOOK OF NUMBERS OF PEOPLE WITH THE SAME COMPLAINT. PLEASE INVESTIGATE THIS MATTER BEFORE SOMEONE IS KILLED.

18

**GM Concealed the Headlight Defect From the Public**

51.     While GM has been fully aware of the Headlight Defect in the Class Vehicles since 2010, it actively concealed the existence and nature of the defect from Plaintiff and Class Members at the time of purchase, lease, or repair and thereafter. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair: any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the headlights; that the Class Vehicles, including their headlights, were not in good working order, were defective, and were not fit for their intended purposes; and that the Class Vehicles and their headlights were defective, even though GM learned of such defects through customer complaints, as well as through other internal sources, as early as 2010.

52.     Plaintiff and other Class Members relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the Class Vehicles in making their purchases.

53.     Rather than repairing or replacing the defective headlights with headlights that do not have the Headlight Defect, GM issued a series of technical service bulletins advising its technicians to make repairs with the same defective parts. Furthermore, when consumers present the Class Vehicles to an authorized GM dealer for repair of the headlights, rather than repair the problem under warranty, GM dealers either inform consumers that their vehicle headlights are functioning properly or charge the customers for repairs.

54.     GM failed to disclose the defect to owners and lessees of the Class Vehicles, including Plaintiff and members of the Class, even though GM knew or should have known of the defect and its associated safety hazards.

55.     To date, the Headlight Defect remains unresolved and uncured.

56.     GM has caused Plaintiff and Class Members to expend money at its dealerships to diagnose, repair, or replace the Class Vehicles' headlights and their component parts, despite GM's knowledge of the Headlight Defect.

57.     Moreover, had Plaintiff and Class Members known of the Headlight Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Further, because of the Headlight Defect, the Class Members' vehicles have a lower market value, and are inherently worth less than they would be. For this reason, Plaintiff and Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

**Plaintiff Truesdell's Experience**

58.     On February 22, 2014, Mr. Truesdell purchased a new 2014 Cadillac SRX from ELCO Cadillac, an authorized Cadillac dealer in Ballwin, MO.

59.     Prior to his purchase, Mr. Truesdell had obtained information about the Class Vehicles on GM's website, at St. Louis Auto Shows, and in online reviews from various sources, and had test driven them on multiple occasions.

60.     In making his purchase, Mr. Truesdell relied on GM's representations in its marketing and advertising materials that Class Vehicles would be free from defects and safe to operate.

61.     Beginning in or about July of 2018, Mr. Truesdell noticed that the headlights in his Cadillac SRX were failing to illuminate the road at night.

62.     Since he first noticed the Headlight Defect in his vehicle, the problem has gotten progressively worse, so that the headlights provide almost no illumination. Specifically, Mr. Truesdell recalls that as of March 2019, the headlights were providing almost no illumination.

63.     In March of 2019, Mr. Truesdell informed one of ELCO Cadillac's service managers about the Headlight Defect in his vehicle.

64.     The service manager informed Mr. Truesdell that they were aware of the Headlight Defect and were seeing it routinely as the Class Vehicles age. The service manager stated that the dim headlights were caused by a leak in the headlight seal that caused corrosion on the electrical contacts of the headlights, resulting in a voltage drop to the headlights. ELCO Cadillac did not repair or replace the defective headlights in Mr. Truesdell's vehicle.

65.     During the week of June 17th, 2019, Mr. Truesdell again took his vehicle to ELCO Cadillac due to the Headlight Defect. Mr. Truesdell informed the service manager of the many online postings and complaints regarding the Headlight Defect and of the TSBs set forth above.

66.     The service manager told Mr. Truesdell that there was nothing that they were authorized to do about the Headlight Defect, but advised him to contact Cadillac's national customer line. The service manager also informed Mr. Truesdell that he would not allow his own children to drive a Class Vehicle at night due to the Headlight Defect, and that one of his technicians did a test drive of a Class Vehicle at night and was alarmed by the lack of light emitted due to the Headlight Defect.

67.     When Mr. Truesdell called the Cadillac national customer line within the next week, Cadillac's representative informed him that they were opening a case and would resolve the problem. Moreover, the Cadillac representative stated that the Headlight Defect was a known issue.

68.     Several days after this phone call, Mr. Truesdell was informed by an ELCO Cadillac service manager over the phone that, according to Cadillac's District Manager, Cadillac would not help with this issue. The service manager informed Mr. Truesdell that he believed the

21

District Manager was indicating that GM would not repair his vehicle to avoid creating any additional record of GM taking responsibility to fix the Headlight Defect. Thus, Cadillac would not fix the Headlight Defect in Mr. Truesdell's vehicle.

69.     Instead, the service manager offered to sell Mr. Truesdell new headlamp units at wholesale, which would have cost Mr. Truesdell approximately $2,000. Moreover, the Headlight Defect would still exist in the new headlamp units.

70.     After Mr. Truesdell was informed that GM would not fix the Headlight Defect, he received an email from Cadillac Customer Assistance on June 28, 2019 that stated in part: "If your situation has been resolved to your satisfaction, no further action is necessary. If it has not, we invite you call us back to discuss further. Please refer to the service request number listed below when you reach our representative."[10]

71.     Mr. Truesdell responded by email that same day, stating in part that the defect in his vehicle's headlights had not been resolved and that he was considering litigation based on GM's failure to stand behind their product and resolve this issue. *Id*.

72.     Mr. Truesdell did not receive an email response from GM based on his email, but within a few days of his email he again called Cadillac's national customer line to speak with its representative, who reiterated that GM would not remedy the Headlight Defect in his vehicle.

73.     Accordingly, GM refused to fix the Headlight Defect in Mr. Truesdell's vehicle, despite having knowledge of the defect prior to the time when Mr. Truesdell originally purchased his vehicle.

---

[10] Ex. G (email exchange between Mr. Truesdell and GM).

74.     Mr. Truesdell's Cadillac SRX has and continues to exhibit the Headlight Defect described herein, and he has suffered and will continue to suffer a loss as a result of the Headlight Defect.

75.     The headlights in Mr. Truesdell's Cadillac SRX continue to malfunction, and he fears they can fail completely at any time without warning.

76.     Mr. Truesdell purchased his vehicle for personal, family, or household purposes.

77.     GM did not disclose the Headlight Defect to Mr. Truesdell before Mr. Truesdell purchased his Class Vehicle. Had GM disclosed the Headlight Defect, he would not have purchased his Class Vehicle. GM's omissions were material to his decision to purchase his Class Vehicle. At all times, Mr. Truesdell has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## GM'S PRACTICES ARE UNETHICAL AND VIOLATED ESTABLISHED ETHICAL STANDARDS

78.     GM's practice of selling or leasing vehicles with defective headlights as described herein, without disclosing the defect prior to the time of sale or lease to consumers, as alleged herein, violates generally accepted ethical principles of business conduct.

79.     The basis for the allegation that it was unethical to engage in the above practices comes, in part, from established ethical principles recognized by the Direct Marketing Association ("DMA") (now part of the Association of National Advertisers), the leading industry association for companies that, like GM, market directly to consumers, and the American Marketing Association, "the leading organization for marketers [and] the trusted go-to resource for marketers and academics."[11]

---

[11] https://www.crunchbase.com/organization/american-marketing-association#section-overview (accessed 7/20/2019).

**DMA Ethical Guidelines**

80.     DMA published principles of ethical business practices in Direct Marketing

Association's Guidelines for Ethical Business Practices ("DMA Ethical Guidelines") (2014), Ex.

H, which is incorporated herein by reference.

81.     These Ethical Guidelines "are intended to provide individuals and organizations

involved in direct marketing in all media with generally accepted principles of conduct." *Id*. at 2.

82.     The Ethical Guidelines apply to all marketers, not just those that belong to DMA.

DMA states that they "reflect DMA's long-standing policy of high levels of ethics and the

responsibility of the Association, its members, *and all marketers* to maintain consumer and

community relationships that are based on fair and ethical principles." *Id*. (emphasis added).

83.     DMA's Ethical Guidelines are set forth in a series of "Articles," each of which

states a separate ethical principle.

84.     Article #1 of DMA's Ethical Guidelines is "HONESTY AND CLARITY OF

OFFER." It states: "All offers should be clear, honest and complete so that the consumer may

know the exact nature of what is being offered …."

85.     By not giving potential purchasers or lessees any information about the Headlight

Defect prior to their purchase or lease of a Class Vehicle, GM violated this principle because its

offer was not clear, honest and complete.

86.     Article #2 of DMA's Ethical Guidelines is "ACCURACY AND

CONSISTENCY." It states: "Simple and consistent statements or representations of all the

essential points of the offer should appear in the promotional material. The overall impression of

an offer should not be contradicted by individual statements, representations or disclaimers."

87.     DMA published a companion volume to its Ethical Guidelines called *Do the Right*

*Thing: A Companion to DMA's Guidelines for Ethical Business Practice* (Revised January 2009)

("*Do the Right Thing*"), Ex. I, incorporated herein by reference. That volume is intended to "give [] direct marketers advice on how to assure their business practices comply with" the Ethical Guidelines. *Do the Right Thing* at 2.

88.     In *Do the Right Thing*, DMA elaborates on Article #2 of its ethical principles. It states: "Keep in mind that a disclaimer or disclosure alone usually is not enough to remedy a misleading or false claim."

89.     By not including any information about the Headlight Defect in material that it made available to consumers prior to their purchases or leases of Class Vehicles, GM violated the ethical principle in DMA's Article #2 because the information GM provided did not contain all the essential points of the offer. It omitted the point that its vehicles contain the Headlight Defect.

90.     In July 2018, DMA (then going by the name "Data & Marketing Association") was acquired by the Association of National Advertisers ("ANA"), "one of the oldest and most venerated trade association in the marketing industry."[12] General Motors is a member of ANA[13] and is represented on its Board of Directors.[14]

91.     ANA adopted DMA's Ethical Guidelines, which it publishes on its web site as Part II of its Member Principles under the heading, "Marketing."[15] Thus, these ethical principles are still current and applicable, and, as a member of ANA, GM subscribes to them.

---

[12] https://www.ana.net/content/show/id/49074 (accessed 7/21/2019).
[13] https://www.ana.net/members/list (accessed 7/23/2019).
[14] https://www.ana.net/content/show/id/board (accessed 7/23/2019).
[15] https://thedma.org/accountability/ethics-and-compliance/dma-ethical-guidelines/ (accessed 7/21/2019).

**AMA Statement of Ethics**

92.     The American Marketing Association ("AMA") "commits itself to promoting the highest standard of professional ethical norms and values ..." Ex. J.[16] As such, it has published its "Statement of Ethics." *Id.* AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers ...)." *Id.* Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations." *Id.*

93.     The AMA's Ethical Norms state that marketers must "consciously avoid [] harmful actions and omissions," "striv[e] for good faith and fair dealing," "avoid [] deception in ... pricing, communication, and delivery of distribution," and affirm "core values" of honesty, ... fairness [and] transparency."

94.     By not including any information about the Headlight Defect in material that it made available to consumers prior to their purchases or leases of Class Vehicles, GM violated these Ethical Norms because, among other reasons, it did not strive (or achieve) good faith and fair dealing, did not avoid deception in communication, and did not affirm the core values of honesty, fairness and transparency.

95.     The AMA has also published "Ethical Values," which "represent the collective conception of what communities find desirable, important and morally proper." *Id.* AMA states that marketers' Ethical Values include honesty, meaning "[s]triv[ing] to be truthful in all situations and at all times" and "[h]onoring our explicit and implicit commitments and promises."

---

[16] Available at https://www.ama.org/codes-of-conduct/ (accessed 7/21/2019).

96.     Another Ethical Value, according to the AMA, is fairness, which includes "[r]epresent[ing] products in a clear way in selling, advertising and other forms of communication," "avoid[ing] false, misleading and deceptive promotion," and "[r]efusing to engage in 'bait-and-switch' tactics." *Id.*

97.     Yet another Ethical Value, according to the AMA, is "Transparency," which includes "[s]triv[ing] to communicate clearly with all constituencies." *Id.*

98.     By not disclosing any information regarding the Headlight Defect in material that it made available to consumers prior to their purchases or leases of GM's vehicles, and by failing to repair the defect, GM violated these Ethical Values, because, among other reasons, it was not truthful (to say nothing of not striving to be truthful) in all situations, did not honor its explicit and implicit commitments and promises, did not represent its products in a clear way, did not avoid false, misleading and deceptive promotion, and did not communicate clearly.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

99.     Any applicable statute of limitations has been tolled by GM's knowing and active concealment of the dangerous Headlight Defect and the omissions alleged herein. Through no fault or lack of diligence of their own, Plaintiff and Class Members were deceived regarding the defective headlights and could not reasonably discover the defect and/or the root cause of the defect, or GM's deception with respect to it. When Plaintiff's and Class Members' headlights intermittently malfunction or fail entirely due to the defect, GM dealers either inform consumers that their vehicle headlights are functioning properly, or charge customers for repairs that merely mask the defect.

100.    Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that GM was concealing a defect and/or that the Class Vehicles were equipped with defective headlights or any corresponding safety hazard. As alleged herein, the existence of the Headlight Defect and the safety hazards it creates were

material to Plaintiff and the Class at all relevant times. Furthermore, Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence that GM was concealing the Headlight Defect during any applicable statutes of limitations.

101.    At all times, GM is and was under a continuous duty to disclose to Plaintiff and the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the Headlight Defect and associated safety hazards.

102.    GM knowingly, actively, and affirmatively concealed the facts alleged herein, including the unreasonable safety hazards resulting from the alleged defects. Plaintiff and Class Members reasonably relied on GM's knowing, active, and affirmative concealment.

103.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and GM's fraudulent concealment, and GM is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

104.    **The Class.** Plaintiff brings this action on his own behalf and as a class action on behalf of all Missouri owners or lessees of any 2010-2015 Cadillac SRX vehicle ("the Class"), as well as a Subclass of owners or lessees in Missouri who purchased or leased their Class Vehicle for personal, family, or household purposes ("MMPA Subclass").

105.    Specifically, Plaintiff seeks to represent the following Class:

> All individuals in Missouri who purchased or leased any 2010-2015 Cadillac SRX vehicle.

> ("Class").

> All Class Members within the State of Missouri who purchased or leased any 2010-2015 Cadillac SRX vehicle for personal, family, or household purposes.

> ("MMPA Subclass").

28

Excluded from the Class are officers, directors and employees of GM, counsel and members of the immediate families of counsel for Plaintiff herein, and the judge presiding over this action and any member of the judge's immediate family.

106.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23.

107.    Plaintiff reserves the right to re-define the Class prior to class certification.

108.    **Numerosity.** The members of the proposed Class are so numerous that joinder of all members is impracticable. The precise number of Class Members is unknown at this time, as such information is in the exclusive control of GM. The Class Members are readily identifiable from information and records in GM's possession, custody, or control.

109.    **Common Questions of Law and Fact and Predominance.** Numerous questions of law and fact are common to Plaintiff and the Class Members and predominate over any individual questions. Such common legal and factual questions include, but are not limited to:

a.  Whether Class Vehicles suffer from defects relating to the headlights;

b.  Whether the defects relating to the headlights constitute an unreasonable safety risk;

c.  Whether GM knows about the defects relating to the headlights and, if so, how long GM has known of the defect;

d.  Whether GM has a duty to disclose the defective nature of the headlights to Plaintiff and Class Members;

e.  Whether GM's acts and practices described herein are unfair, deceptive, and/or constitute omission of a material fact under the MMPA;

f.  Whether Plaintiff and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

g.  Whether GM knew or reasonably should have known of the defects relating to the headlights before it sold and leased Class Vehicles to Class Members;

h.  Whether GM should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective headlight components;

i.  Whether GM is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective headlight components;

j.  Whether GM breached the implied warranty of merchantability; and

k.  Whether GM breached the implied warranty of merchantability pursuant to the Magnuson-Moss Act.

110.  **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and consumer class actions.

111.  Plaintiff and counsel are committed to prosecuting this action vigorously on behalf of the Class, and do not have any interests that are contrary to or in conflict with those of the Class they seek to represent.

112.  **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and all Class Members have suffered damages as a result of GM's actions and practices alleged herein. Specifically, Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective headlights. Plaintiff, like all Class Members, has been damaged by GM's misconduct in that he has incurred or will incur the cost of repairing or replacing the defective headlights components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

113.  **Superiority.** A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

114.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action.

115.    Absent a class action, the vast majority of Class Members likely would not be in a position to litigate their claims individually and would have no effective remedy at law through which to vindicate their claims against GM and be made whole.

116.    Class treatment will conserve the resources of the courts and the litigants, and further efficient adjudication of Class Member claims.

## COUNT I: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Plaintiff and the Class)

117.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

118.    GM was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

119.    GM provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

120.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while the Class Vehicles were being operated.

121.    Contrary to the applicable implied warranties, the Class Vehicles and their headlights at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are dangerous due to the Headlight Defect.

122.    The Headlight Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

123.    As a result of GM's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' headlight components have failed or are substantially certain to fail before their expected useful life has run.

124.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

125.    Plaintiff and Class Members are unable to safely drive their vehicles at night or in other dark conditions due to the Headlight Defect.

126.    Plaintiff provided notice to GM of the Headlight Defect, who, as set forth above, declined to provide any remedy.

127.    Accordingly, any further notice to GM by Class Members would be futile and is not required.

128.    GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Class in an amount to be determined at trial.

129.    WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT II: BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2303 *et seq.*
(Plaintiff and the Class)

130.    Plaintiff incorporates by reference all preceding paragraph of this Complaint as if fully set forth herein, and further alleges as follows:

131.    Plaintiff brings this cause of action on behalf of himself and the Class.

132.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

133.    Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

134.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

135.    GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while the Class Vehicles were being operated.

136.    Contrary to the applicable implied warranties, due to the Headlight Defect, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.

137.    GM's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

138.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or

value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

139.    GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the headlights, and through Plaintiff's communications with Cadillac's national representatives as set forth above.

140.    As a direct and proximate cause of GM's breach of implied warranties, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

141.    As a result of GM's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

142.    WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT III: VIOLATION OF THE MMPA BY MEANS OF DECEPTION
(Plaintiff and the MMPA Subclass)

143.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows:

144.    The actions of GM alleged herein violated, and continue to violate, the Missouri Merchandising Practices Act ("MMPA") because they constitute deception.

145.    The MMPA, Mo. Rev. Stat. § 407.020, states in relevant part:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

34

trade or commerce . . . is declared to be an unlawful practice.

146.     Plaintiff, on behalf of himself and all others similarly situated in Missouri, is

entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part

that:

> 1. Any person who purchases or leases merchandise primarily for personal, family
> or household purposes and thereby suffers an ascertainable loss of money or
> property, real or personal, as a result of the use or employment by another person
> of a method, act or practice declared unlawful by section 407.020, may bring a
> private civil action in either the circuit court of the county in which the seller or
> lessor resides or in which the transaction complained of took place, to recover
> actual damages. The court may, in its discretion, award punitive damages and may
> award to the prevailing party attorney's fees, based on the amount of time
> reasonably expended, and may provide such equitable relief as it deems necessary
> or proper.

> 2. Persons entitled to bring an action pursuant to subsection 1 of this section may,
> if the unlawful method, act or practice has caused similar injury to numerous other
> persons, institute an action as representative or representatives of a class against
> one or more defendants as representatives of a class . . . . In any action brought
> pursuant to this section, the court may in its discretion order, in addition to damages,
> injunction or other equitable relief and reasonable attorney's fees.

147.     The MMPA defines "merchandise" as any objects, wares, goods, commodities,

intangibles, real estate or services. Mo. Rev. Stat. § 407.010. Thus, the vehicles that GM sell and

lease to consumers are merchandise.

148.     By selling and leasing its vehicles to consumers, GM is engaging in the sale of

merchandise in trade or commerce.

149.     Plaintiff and the MMPA Subclass purchased or leased their Class Vehicles for

personal, family, or household purposes but received vehicles with the Headlight Defect,

described herein.

150.     The Missouri Attorney General has promulgated regulations defining the meaning

of deception as used in the MMPA. That definition states that deception "is any method, act, use,

practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." 15 C.S.R. § 60-9.020(1).

151.    The regulations further provide that reliance, actual deception, knowledge of deception and intent are not elements of deception under the MMPA: "Reliance, actual deception, knowledge of deception, intent to mislead or deceive, or any other culpable mental state such as recklessness or negligence, are not elements of deception as used in section 407.020.1, RSMo ." 15 C.S.R. § 60-9.020.

152.    Pursuant to the MMPA, GM has a duty not to engage in any deception in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

153.    By promoting its vehicles as containing usable headlights even though those headlights had the Headlight Defect, GM engaged in deception in violation of the MMPA, because such acts or practices have the tendency or capacity to mislead, deceive, cheat, and/or create a false impression as to the ability of consumers to use the headlights in their vehicles. Mo. Rev. Stat. 407.020.1.

154.    Plaintiff and the MMPA Subclass have suffered ascertainable loss as a result of GM's promoting of its vehicles as containing usable headlights without referencing the Headlight Defect, as they paid for vehicles with properly functioning headlights but instead received vehicles that have defective headlights that are therefore worth a lesser value.

155.    GM's deceptive acts and practices have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff and the MMPA Subclass.

156.    GM's deceptive acts and practices in violation of the MMPA were performed willfully and wantonly, were outrageous and were done in reckless indifference to the rights of Plaintiff and the MMPA Subclass.

157.    WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT IV: VIOLATION OF THE MMPA BY MEANS OF OMISSION OF A MATERIAL FACT
(Plaintiff and the MMPA Subclass)

158.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows:

159.    The actions of GM alleged herein violated, and continue to violate, the Missouri Merchandising Practices Act ("MMPA") because they constitute omission of a material fact.

160.    Mo. Rev. Stat. § 407.020.1 prohibits by any person "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

161.    The Missouri Attorney General has promulgated regulations defining the meaning of omission of a material fact as used in the MMPA. That definition states that omission of a material fact is "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 C.S.R. § 60-9.110.

162.    A material fact is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular

consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 C.S.R. § 60-9.010.

163.    Pursuant to the MMPA, GM has a duty not to omit material facts in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

164.    As set forth above, GM was aware of the Headlight Defect in the Class Vehicles since at least 2010.

165.    Even if GM had been unaware of the Headlight Defect, which it was not, the Headlight Defect would have been known to it upon reasonable inquiry. As shown by its Technical Service Bulletins and Customer Service Campaign set forth herein, testing and monitoring consumer complaints of its headlights are acts that GM performs, and should perform.

166.    The existence of the Headlight Defect is a material fact, because a reasonable consumer would likely consider it important to know, when purchasing or leasing a vehicle, that the headlights in the vehicle do not emit sufficient light to enable the driver to drive in dark conditions, so that the vehicle is not safely drivable in such conditions.

167.    Furthermore, the existence of the Headlight Defect is also a material fact because a reasonable consumer would likely be induced to change his or her decision to purchase or lease one of GM's vehicles based on knowing that the headlights in the vehicle do not emit sufficient light to enable the driver to drive in dark conditions, so that the vehicle is not safely drivable in such conditions.

168.    Despite its knowledge of the Headlight Defect since at least 2010, GM omitted any reference of the Headlight Defect to Plaintiff and the MMPA Subclass prior to their

purchases or leases of GM's vehicles. At a minimum, GM omitted material facts by not giving Plaintiff and the MMPA Subclass information prior to their purchases similar to that contained in the Technical Service Bulletins and Customer Service Campaign set forth herein.

169.    Accordingly, GM's selling and leasing of vehicles with defective headlights to Plaintiff and MMPA Subclass Members, without disclosing the known defect prior to their purchases or leases, constitutes omission of a material fact under the MMPA.

170.    Moreover, GM's omission of any information regarding the Headlight Defect to Plaintiff and the MMPA Subclass prior to their purchases or leases was purposeful. As set forth above, GM knew about the Headlight Defect since at least 2010 and continued to market and sell the Class Vehicles, yet failed to inform Plaintiff and MMPA Subclass Members of the Headlight Defect prior to their purchases or leases.

171.    Plaintiff and the MMPA Subclass have suffered ascertainable loss as a result of GM's failure to provide them with any information regarding the Headlight Defect prior to their purchases or leases, as they paid for vehicles with properly functioning headlights without being informed of the Headlight Defect, but instead received vehicles that have defective headlights that are therefore worth a lesser value.

172.    GM's omissions have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff and the MMPA Subclass.

173.    GM's omissions in violation of the MMPA were performed willfully and wantonly, were outrageous and were done in reckless indifference to the rights of Plaintiff and the MMPA Subclass.

174.    WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT V: VIOLATION OF THE MMPA BY MEANS OF UNFAIR PRACTICES-<br>FAILURE TO DISCLOSE THE HEADLIGHT DEFECT
### (Plaintiff and the MMPA Subclass)

175.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

176.    The actions of GM alleged herein in failing to disclose the Headlight Defect to Plaintiff and MMPA Subclass Members prior to their purchases or leases of GM's vehicles violated, and continue to violate, the Missouri Merchandising Practices Act ("MMPA") because they constitute unfair practices.

177.    Mo. Rev. Stat. § 407.020.1 prohibits by any person "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

178.    The Missouri Attorney General has promulgated regulations defining the meaning of unfair practice as used in the MMPA. That definition states that unethical practices are unfair in violation of the above statute. Mo. Code Regs. tit. 15, § 60-8.020.

179.    Pursuant to the MMPA, GM has a duty not to engage in any unethical or unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

180.    Selling or leasing vehicles to Plaintiff and MMPA Subclass Members that contain defective headlights, while knowing of the defect but not disclosing it prior to Plaintiff's and MMPA Subclass Members' purchases or leases, is unfair and unethical and violates generally accepted principles of ethical business conduct, including the principles of the Direct Marketing Association and American Marketing Association, as set forth above.

181.     As set forth above, GM has known about the Headlight Defect since at least 2010. Yet it failed to inform Plaintiff and the MMPA Subclass about the Headlight Defect prior to their purchases or leases of GM's vehicles.

182.     GM's unfair and unethical actions in failing to inform Plaintiff and the MMPA Subclass about the known Headlight Defect prior to their purchases or leases were therefore purposeful, as GM chose not to give them any information regarding the Headlight Defect prior to their purchases or leases, despite having had knowledge of the Headlight Defect for many years.

183.     Plaintiff and the MMPA Subclass have suffered ascertainable loss by paying for vehicles with properly functioning headlights without being told of the Headlight Defect by GM prior to their purchases or leases, but instead received vehicles that have defective headlights that are therefore worth a lesser value.

184.     GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the MMPA Subclass in an amount to be determined at trial.

185.     GM's unfair and unethical acts and practices in violation of the MMPA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff and the MMPA Subclass.

186.     WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT VI: UNJUST ENRICHMENT
(Plaintiff and the Class)

187.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

41

188.     Substantial benefits have been conferred upon GM from Plaintiff and Class Members by Plaintiff and Class Members purchasing or leasing GM's vehicles that have the Headlight Defect.

189.     As set forth above, GM either knew or should have known that it was selling or leasing vehicles with the Headlight Defect and that it was therefore accepting money through Plaintiff's and Class Members' purchases or leases of its vehicles that was in part for the defective headlights. Yet GM failed to inform Plaintiff and Class Members of the Headlight Defect prior to their purchases or leases. For GM to retain the benefit of Plaintiff's and Class Members' payments for defective headlights in their Class Vehicles is inequitable under these circumstances.

190.     GM's acceptance and retention of these benefits under the circumstances make it inequitable for GM to retain these benefits without payment of the value to Plaintiff and the Class.

191.     Plaintiff and the Class are entitled to recover from GM all amounts wrongfully collected and improperly retained by GM based on its practice of selling or leasing vehicles that have defective headlights.

192.     As a direct and proximate result of GM's wrongful conduct and unjust enrichment, Plaintiff and the Class are entitled to restitution from, and institution of, a constructive trust disgorging all profits, benefits, and other compensation obtained by GM, plus attorneys' fees, costs, and interest thereon.

193.     WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray judgment against GM as follows:

1. Certifying the Class as requested herein;

2. Entering an order appointing Law Office of Richard S. Cornfeld, LLC as lead counsel for the Class;

3. Awarding actual damages against GM in an amount to be determined;

4. Awarding punitive damages against GM as the Court deems necessary or proper;

5. Awarding injunctive relief as permitted by law or equity, including a preliminary and permanent injunction enjoining GM from continuing the unlawful practices as set forth herein;

6. Awarding pre-judgment and post-judgment interest;

7. Awarding reasonable attorneys' fees and costs herein;

8. Awarding such other and further relief as the Court deems fit and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: July 29, 2019                        Respectfully submitted,

                                            **LAW OFFICE OF RICHARD S. CORNFELD, LLC**

                                            By: _/s/ Richard S. Cornfeld_
                                                Richard S. Cornfeld, MO Bar #31046
                                                Daniel S. Levy, MO Bar #66039
                                                1010 Market Street, Suite 1645
                                                St. Louis, MO 63101
                                                P. 314-241-5799
                                                F. 314-241-5788
                                                rcornfeld@cornfeldlegal.com
                                                dlevy@cornfeldlegal.com

43

*Attorneys for Plaintiff*